# EXHIBIT A

# Part 1

ADR-106

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, ~~state bar~~ number, and address):*<br>R. Alexander Pilmer (SBN 166~~...~~)<br>Kirkland & Ellis LLP<br>333 South Hope Street, Suite 2900<br>Los Angeles, California 90071<br>TELEPHONE NO.: (213) 680-8400    FAX NO. *(Optional):* (213) 680-8500<br>E-MAIL ADDRESS *(Optional):* apilmer@kirkland.com<br>ATTORNEY FOR *(Name):* Aeryon Labs, Inc. | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**10/30/2019** at 10:48:46 AM<br>Clerk of the Superior Court<br>By Michael Clemens, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 325 South Melrose Dr.
MAILING ADDRESS:
CITY AND ZIP CODE: Vista, CA 92081
BRANCH NAME: North County Regional Center

PETITIONER: Aeryon Labs, Inc.

RESPONDENT: Datron World Communications, Inc.

| PETITION TO [✓] CONFIRM   [ ] CORRECT   [ ] VACATE<br>CONTRACTUAL ARBITRATION AWARD | 37-2019-00058740-CU-PA-NC |
|---|---|

**Jurisdiction** *(check all that apply):*
[ ] **Action is a limited civil case**
  Amount demanded    [ ] does not exceed $10,000
          [ ] exceeds $10,000, but does not exceed $25,000
[✓] **Action is an unlimited civil case** (exceeds $25,000)

**NOTICE:** You may use this form to request that the court confirm, correct, or vacate an award in an arbitration conducted pursuant to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq. and that does not involve an attorney-client fee dispute. If you are requesting court action after an attorney-client fee arbitration award, please read Alternative Dispute Resolution form ADR-105, *Information Regarding Rights After Attorney-Client Fee Arbitration.*

1. **Petitioner and respondent.** Petitioner *(name each):*

   Aeryon Labs, Inc.


   alleges and requests relief against respondent *(name each):*
   Datron World Communications, Inc., a California corporation



2. **Contractual arbitration.** This petition requests the court to confirm, correct, or vacate an award in an arbitration conducted according to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq.

3. **Pending or new action.**
   a. [ ] A court case is already pending, and this is a petition filed in that action. *(If so, proceed to item 4.)*
   b. [✓] This petition commences a new action. *(If so, complete items 3b(1) through 3b(4).)*
      (1) **Petitioner's capacity.** Each petitioner named in item 1 is an individual,
         [✓] except petitioner *(state name and complete one or more of the following):* Aeryon Labs, Inc.
         (a) [ ] is a corporation qualified to do business in California.
         (b) [ ] is an unincorporated entity *(specify):*
         (c) [ ] is a representative *(specify):*
         (d) [✓] is *(specify other capacity):* a Canadian Corporation

      (2) **Respondent's capacity.** Each respondent named in item 1 is an individual,
         [✓] except respondent *(state name and complete one or more of the following):* Datron World Comm'ns, Inc.
         (a) [ ] is a business organization, form unknown.
         (b) [✓] is a corporation.
         (c) [ ] is an unincorporated entity *(specify):*
         (d) [ ] is a representative *(specify):*
         (e) [ ] is *(specify other capacity):*

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>ADR-106 [New January 1, 2004] | **PETITION TO CONFIRM, CORRECT, OR VACATE<br>CONTRACTUAL ARBITRATION AWARD**<br>**(Alternative Dispute Resolution)** | Code of Civil Procedure, § 1285 et seq. |

**EXHIBIT A**
**Page 1**

| PETITIONER: Aeryon Labs, Inc. | CASE NUMBER: |
|---|---|
| RESPONDENT: Datron World Communications, Inc. | |

3. b. (3) **Amount or property in dispute.** This petition involves a dispute over *(check and complete all that apply)*:

    (a) ☑ the following amount of money *(specify amount)*: $ 2,127,445.75

    (b) ☐ property *(if the dispute involves property, complete both of the following)*:

        (i) consisting of *(identify property in dispute)*:

        (ii) having a value of *(specify value of property in dispute)*: $

    (4) ☑ **Venue.** This court is the proper court because *(check (a) or (b))*:

    (a) ☐ this is the court in the county in which the arbitration was held.

    (b) ☑ the arbitration was not held exclusively in any county of California, or was held outside of California,
        **and** *(check one or more of the following)*:

        (i) ☐ this is the court in the county where the agreement was made.

        (ii) ☐ this is the court in the county where the agreement is to be performed.

        (iii) ☑ the agreement does not specify a county where it is to be performed and was not made in any
            county in California, and the following party resides or has a place of business in this county
            *(name of party)*:

            Datron World Communications, Inc.

        (iv) ☐ the agreement does not specify a county where it is to be performed and was not made in any
            county in California, and no party to this action resides or has a place of business in California.

4. **Agreement to arbitrate.**

    a. **Date.** Petitioner and respondent entered into a written agreement on or about *(date)*: July 20, 2012

    b. ☑ **Attachment.** A copy of the agreement is submitted as Attachment 4(b) and incorporated herein by this reference.

    c. **Arbitration provision.** Paragraph ___19___ of the agreement provides for arbitration of disputes arising out of the
    agreement as follows *(either copy the arbitration provision in full or summarize the provision)*:

    "Any dispute. . .arising out of, relating to, or in connection with this Agreement shall be finally settled by
    Arbitration. The Arbitration shall be conducted in accordance with the Rules of Conciliation and
    Arbitration of the ICC in effect at the time of the arbitration."

5. **Dispute subject to arbitration.** A dispute arose between petitioner and respondent concerning the following matter covered by the
agreement to arbitrate *(summarize the dispute)*:

    The parties' disputes included the scope of Datron's exclusive territory under the parties' Agreement;
    whether Aeryon breached the Agreement; whether Aeryon breached the covenant of good faith and fair
    dealing; and whether Aeryon committed fraud against Datron related to the Agreement.

6. **Arbitrator.** The following person was duly selected or appointed as arbitrator *(name of each arbitrator)*:

    Hilary Heilbron QC

7. **Arbitration hearing.** The arbitration hearing was conducted as follows *(complete both of the following)*:

    a. **Date** *(each date of arbitration)*: March 18, 2019 - March 22, 2019; April 29, 2019

    b. **Location** *(city and state where arbitration was conducted)*:

    New York City, New York

8. **Arbitration award.**

    a. **Date of award.** The arbitration award was made on *(date)*: September 9, 2019

    b. **Terms of award.** The arbitration award *(check one or more of the following)*:

    (1) ☑ requires ☐ petitioner ☑ respondent to pay the other party this amount: $ $2,127,445.75

    (2) ☐ requires neither party to pay the other anything.

    (3) ☐ is different as to different petitioners and respondents.

    (4) ☑ provides *(specify other terms or check item 8(c) and attach a copy of the award)*:

        Aeryon is entitled to simple interest at the rate of 5% on any outstanding sums not paid by
        Datron by October 25, 2019, with the interest accruing from, and including, October 29, 2019.

    c. ☑ **Attachment of Award.** A copy of the award is submitted as Attachment 8(c).

9. **Service of award.**

    a. The signed award or an accompanying document indicates that the award was served on petitioner on *(date)*:

    b. ☑ Petitioner alleges that a signed copy of the award was actually served on *(date)*: September 10, 2019

**PETITION TO CONFIRM, CORRECT, OR VACATE
CONTRACTUAL ARBITRATION AWARD
(Alternative Dispute Resolution)**

**EXHIBIT A
Page 2**

| PETITIONER: Aeryon Labs, Inc. | CASE NUMBER: |
|---|---|
| RESPONDENT: Datron World Communications, Inc. | |

10. **Petitioner requests that the court** *(check all that apply):*

   a. ☑ **Confirm the award, and enter judgment according to it.**

   b. ☐ **Correct the award and enter judgment according to the corrected award, as follows:**

       (1) The award should be corrected because *(check all that apply):*

         (a) ☐ the amount of the award was not calculated correctly, or a person, thing, or property was not described correctly.

         (b) ☐ the arbitrator exceeded his or her authority.

         (c) ☐ the award is imperfect as a matter of form.

       (2) The facts supporting the grounds for correcting the award alleged in item 10b(1) are as follows *(if additional space is required, check here ☐ and submit facts on an attachment labeled 10b(2)):*

       (3) The award should be corrected as follows *(if additional space is required, check here ☐ and describe requested correction on an attachment labeled 10b(3)):*

   c. ☐ **Vacate (cancel) the award.**

       (1) The award should be vacated because *(check all that apply):*

         (a) ☐ the award was obtained by corruption, fraud, or other unfair means.

         (b) ☐ an arbitrator was corrupt.

         (c) ☐ the misconduct of a neutral arbitrator substantially prejudiced petitioner's rights.

         (d) ☐ the arbitrator exceeded his or her authority, and the award cannot be fairly corrected.

         (e) ☐ the arbitrator unfairly refused to postpone the hearing or to hear evidence useful to settle the dispute.

         (f) ☐ an arbitrator failed to disclose within the time for disclosure a ground for disqualification of which the arbitrator was then aware.

         (g) ☐ an arbitrator should have disqualified himself or herself after petitioner made a demand to do so.

       (2) The facts supporting the grounds for vacating the award alleged in item 10c(1) are as follows *(if additional space is required, check here ☐ and submit facts on an attachment labeled 10c(2)):*

       (3) Petitioner ☐ does ☐ does not request a new arbitration hearing.

   d. ☑ **Award petitioner interest** from *(date):* October 28, 2019

       (1) ☐ at the statutory rate.

       (2) ☑ at rate of __5__ % per year.

   e. ☑ **Award petitioner costs of suit:**

       (1) ☐ in the amount of:  $

       (2) ☑ according to proof.

   f. ☑ **Award petitioner attorney fees incurred in this action** *(check only if attorney fees are recoverable in this action according to statute or the parties' agreement):*

       (1) ☐ in the amount of:  $

       (2) ☑ according to proof.

   g. ☐ **Award petitioner the following other relief** *(describe relief requested; if additional space is required, check here ☐ and describe relief on an attachment labeled 10g):*

11. **Pages and attachments.** Number of pages attached:

Date: October 30, 2019

R. Alexander Pilmer

    (TYPE OR PRINT NAME)

▶ */s/* R. Alexander Pilmer

    (SIGNATURE OF PETITIONER OR ATTORNEY)

**EXHIBIT A**
**Page 3**

# ATTACHMENT 4(b)

# PRIVATE LABEL DISTRIBUTION AGREEMENT

This Private Label Distribution Agreement (the "Agreement") is made and entered into this 20th day of July, 2012, by and between Aeryon Labs, Inc., or any of its wholly-owned subsidiaries, with headquarters located at 60 Bathurst Drive, Unit 1, Waterloo, Ontario, N2V 2A9, CANADA (hereinafter, "Aeryon") and Datron World Communications, Inc., a California corporation with headquarters located at 3030 Enterprise Court, Vista, California 92081, USA (hereinafter, "Datron").

WHEREAS Aeryon is engaged in the design, development, manufacture and sale of aerial vehicle systems, parts, and related accessories as further described in Exhibit B attached hereto;

WHEREAS Datron is engaged in the manufacture, promotion, marketing, sale, distribution, service and support of military communication products and accessories; and

WHEREAS Aeryon and Datron (each a "Party" and collectively the "Parties") desire to cooperate in the promotion, marketing, sale, and distribution of private labeled versions of the Products in the Territory (as hereinafter defined);

NOW THEREFORE, in consideration of the mutual covenants and terms and conditions set forth herein, Aeryon and Datron hereby agree as follows:

## 1   DEFINITIONS

The following words shall mean:

1.1    "Confidential Information" shall be as defined in Article 28 of this Agreement.

1.2    "Customer(s)" shall mean any and all end-user customers for the Products and Private Label Products for applications located in the Territory.

Page 1 of 29

**EXHIBIT A**
**Page 5**

EXHIBIT 4

1.3   "Datron Documentation" shall be as defined in Article 9 of this Agreement.

1.4   "Product(s)" shall mean those items which are supplied by Aeryon to Datron, as listed in Exhibit B of this Agreement, as may be amended from time to time upon mutual written agreement by the Parties.

1.5   "Private Label" shall mean brand markings which are trademarks or branding of Datron.

1.6   "Private Label Products" shall mean those Products which bear the Private Label.

1.7   "Specifications" shall mean the functional, technical and other specifications for the Products as set out in Exhibit C of this Agreement, as may be amended from time to time upon mutual written agreement by the Parties.

1.8   "Territory" for the promotion, marketing, sale, and distribution of the Products and the Private Label Products by Datron shall be listed in Exhibit A of this Agreement, as may be amended from time to time upon mutual written agreement by the Parties.  In addition,  Datron and Aeryon may mutually agree that specific opportunities be added to the "Additional Exceptions" portion of Exhibit A as required to prevent channel conflict.

1.9   "Working Day" shall mean  any day excluding a Saturday, Sunday or statutory holiday in the Province of Ontario and the State of California, and also excluding any day on which the principal chartered banks located in the City of Waterloo or City of Vista are not open for business during normal banking hours.

EXHIBIT 4

**EXHIBIT A**
**Page 6**

## 2      SALES AND PURCHASES OF PRODUCTS

Subject to the terms and conditions of this Agreement, Aeryon agrees to sell to Datron the Products or Private Label Products which Datron may order from Aeryon, as described in the Products/Price Schedule attached and incorporated herein as Exhibit B.  The Products shall be manufactured by Aeryon according to the Specifications set forth in Exhibit C. Subject to the rights and licenses granted to Datron in this Agreement, Aeryon shall retain ownership in and to all intellectual property and other proprietary rights in and to the Products, whether developed or acquired by Aeryon.

## 3      GRANT OF RIGHTS

3.1 OEM RIGHT. Aeryon hereby grants Datron the non-exclusive, non-transferable and non-sublicensable license to promote, market, sell, distribute, and support the Products and Private Label Products as stand-alone products or incorporated into or in connection with Datron's products within the Territory.

3.2 SOFTWARE LICENCE. Aeryon grants to Datron a limited, non-exclusive, transferable and sublicensable license to use the software and related documentation provided by Aeryon to Datron with respect to the Products, including the Private Label Products. Datron acknowledges and agrees that (i) the licensed software and related documentation are the exclusive property of Aeryon and that they contain Confidential Information and trade secrets of Aeryon, (ii) Datron's and its customer's right to use the licensed software and related documentation is only as set out in this Agreement and only with respect to the Products, including the Private Label Products, and (iii) Aeryon has the right to revoke the license granted hereunder as to any unpurchased Products or Private Label Products upon written notice to Datron in the event that Datron breaches this Agreement. The licensed software is licensed to Datron by Aeryon and is not being sold, assigned or transferred to Datron, and Aeryon shall retain at all times the ownership rights, trademarks and copyrights in and to the software and related documentation licensed hereunder. Except as set out herein, this Agreement does not

Page 3 of 29

EXHIBIT 4

grant Datron any intellectual property rights in or to the software or documentation licensed hereunder.  In regard to the software and documentation licensed hereunder, Datron and its sublicensees will not, without the prior written consent of Aeryon:

    a.      use the licensed software and/or documentation except with respect to the Products including the Private Label Products;

    b.      use the licensed software and/or documentation with any other product or equipment, other than in conjunction with the sale, service or repair of the Products or Private Label Products;

    c.      make copies of or distribute or authorize the copying or distribution of the licensed software except in conjunction with the sale, service or repair of the Products or Private Label Products;

    d.      except as authorized herein or by Aeryon, make alterations, enhancements or modifications to the licensed software; and/or

    e.      reverse engineer, decompile or disassemble the licensed software.

Datron shall ensure that any sale of the Products or Private Label Products include language that is no less restrictive with respect to the restrictions on the software license granted herein as is set forth in this Agreement.  Datron shall notify Aeryon immediately in writing upon Datron's discovery of any unauthorized use, copying or distribution of the licensed software, or any other breach of this agreement by Datron or its Customers, and shall co-operate with Aeryon in every reasonable way to help Aeryon regain possession of the licensed software and prevent its further unauthorized use.

3.3 TITLE.  Title to the Private Label Products and Products shall remain vested in Aeryon until complete and final payment of the price by Datron for each particular order. It shall be understood that no intellectual property rights in the Products or Private Label Products shall be transferred at any time to Datron, except for the right to use such intellectual property as part of the use, sale and service of the Products, including the Private Label Products in accordance with the terms of this Agreement.

EXHIBIT 4

**4      PURCHASE ORDERS/PRODUCT SUPPLY**

4.1 PURCHASE ORDERS. Datron purchase orders for Products and Private Label Products shall be submitted to Aeryon in writing. Each purchase order shall include, at a minimum:

Identification of Products ordered;

Quantity to be purchased;

Price of Products ordered;

Requested delivery dates;

Shipping instructions.

4.2 FORECASTS. Datron will provide Aeryon with estimated non-binding, six-month, rolling forecasts of its requirements for all forms of Products on a quarterly basis (the "Forecasts"). The Forecasts shall be in any format that is convenient to Datron. Notwithstanding the foregoing, Datron is under no obligation to purchase the Products in accordance with such Forecasts and any such Forecasts cannot form the basis for any claim of damages by Aeryon. Aeryon and Datron shall conduct quarterly joint pipeline reviews for the purpose of pre-empting channel conflict, identifying appropriate areas of investment and focus for each party and to collaborate where appropriate to open markets and close sales.

4.3 ACCEPTANCE BY AERYON. Subject to the establishment of mutually agreeable delivery dates and compliance by Datron with the other terms of this Agreement, Aeryon shall accept and acknowledge in writing all purchase orders submitted by Datron for Products or Private Label Products within ten (10) Working Days after Aeryon's receipt of such purchase orders. Aeryon shall use commericially reasonable efforts to keep a sufficient supply of the Products consistent with the Forecasts and ordering history to enable Aeryon to fill purchase orders submitted by Datron.Each acknowledgment shall include a firm shipping date for the Products or Private Label Products ordered in the purchase order.

**EXHIBIT A**
**Page 9**

EXHIBIT 4

4.4  RESCHEDULED DELIVERIES. Notwithstanding anything to the contrary in this Section 4.4, in the event Aeryon reschedules the delivery of any Product or Private Label Product order, or part thereof, by twenty-one (21) Working Days or more, or if Aeryon is twenty-one (21) Working Days or more late in delivering a Product order or part thereof, then following written notice by Datron to Aeryon of the missing part of the Product or Private Label Product order or following Datron's receipt of the notice by Aeryon of the required rescheduling of the order, Datron shall have the right to cancel the unshipped portion of any such rescheduled or late order without penalty.

## 5     PRICES; PAYMENT

5.1 PRICES. The prices to be paid by Datron for the Products and Private Label Products shall be the prices contained in the attached Exhibit B. Prices are exclusive of any sales, use, excise, value added or other taxes, customs duties and freight charges applicable to the sale of the Products and Private Label Products by Aeryon to Datron. If any such charges are applicable, they will be added to the invoice.  Such prices shall be fixed for one (1) year, commencing with the Effective Date of this Agreement, except that if Aeryon's price for a comparable standard product is reduced, such reduction shall be immediately effective and shall apply to purchase orders received after such reduction.  Sixty (60) days prior to the one year anniversary of the Effective Date of this Agreement and any subsequent years of the Agreement, the Parties shall negotiate, in good faith, the pricing to be applied to the Products and Private Label Products for the ensuing year of the Agreement.  In the event that the Parties acting each in good faith are unable to reach an agreement on the pricing for the following year, then Aeryon upon giving written notice to Datron shall be under no further obligation to sell any of the Products or Private Label Products to Datron.

5.2 PAYMENT TERMS. Datron shall pay Aeryon  a 30% deposit with the placement of each order and the balance will be paid net thirty (30) days from shipment, following receipt of an invoice from Aeryon to Datron.  Except as otherwise specified herein, all payments required to be made under this Agreement shall be in US dollars.

Page 6 of 29

In the case of a conflict between the terms of this Agreement and the terms and conditions of a purchase order, this Agreement shall control to the extent required to resolve the inconsistency.

## 6   LABELLING AND PACKAGING

6.1 LABELLING.  Aeryon shall make and label the Products purchased by Datron, if requested by Datron, using the trademarks, logos and symbols owned by Datron and the insignia, designs, artworks, product configurations, packages designs and all other decorative features of any kind (the "Datron Materials") as specified by Datron.  Datron shall provide Aeryon with specifications in connection with the labels and packaging.  All Datron Materials for the Private Label Products shall be supplied by Datron, or ordered and supplied by Aeryon at the cost and expense of Datron.  Datron shall have the opportunity to review and approve samples of the labels and packaging prior to final printing or manufacture, if same are ordered and supplied by Aeryon.  The initial costs associated with the labeling of the Products shall be at the expense of Datron, and shall be invoiced under a separate purchase order.

6.2 PACKAGING. Unless otherwise specified by Datron, Aeryon will package and pack all goods in a manner which is (i) in accordance with good commercial practice, (ii) acceptable to common carriers for shipment , (iii) in accordance with the International Chamber of Commerce regulations ("ICC"), and (iv) adequate to ensure safe arrival of the goods at the named destination. Aeryon will mark all containers in a manner that is consistent with industry standards, which may include, if required, the necessary lifting, handling and shipping information and with purchase order numbers, date of shipment, and the names of the consignee and consignor. An itemized packing list must accompany each shipment which shall include (i) prominently the purchase order number and (ii) the description, part number, revision level, and quantity of the Products or Private Labeled Products so shipped.

Page 7 of 29

6.3 MODIFICATION OF LABELLING OR PACKAGING.  If Datron wishes to change its labels or packaging, Datron will give Aeryon at least 60 days prior written notice and will reimburse Aeryon the costs of the labels and packaging in inventory which can no longer be utilized as a result of the change unless Datron shall have previously paid for any of such packaging or inventory.  Such reimbursement will be made within 10 days following receipt by Datron of a notice from Aeryon of the number and unreimbursed costs of the labels and packaging, if any, rendered obsolete as a result of such change together with delivery of the obsolete labels.

7       PRODUCT ACCEPTANCE AND QUALITY

7.1 INSPECTION AND ACCEPTANCE BY DATRON.  Notwithstanding any prior inspection or payment by Datron, all Products and Private Label Products will be subject to final inspection and acceptance at Datron's specified destination after delivery by Aeryon. Failure by Datron to accept or provide written notice to Aeryon of rejection of the same within thirty (30) days of delivery of the same shall be deemed to constitute acceptance.  In the event the Products or Private Label Products fail to meet the Specifications, and Datron provides such notification of the deficiencies with respect to the same within such 30 day period, Aeryon, shall at its sole option, correct, repair or replace the Products or Private Label Products or any component or part of the same proven to be defective.

7.2 RETURN PROCEDURE. In the event Datron rejects a delivery or part thereof due to non-conformance to Specifications, Datron shall return the effected items to Aeryon F.O.B. (as defined in accordance with the most current version of Incoterms ("Incoterms"), as published by the ICC at Datron's location.

Page 8 of 29

8      PRODUCT SPECIFICATIONS; TESTING

8.1 SPECIFICATIONS. Aeryon agrees to supply the Products and Private Label Products according to the Specifications described in Exhibit C. Aeryon shall not make any changes in the Specifications unless it provides Datron with at least 90 days prior written notice.  Datron shall notify Aeryon within 90 days of any changes it makes in the Specifications, provided however Datron shall not be required to provide Aeryon any information with respect to any payload or payload modifications that it implements.

8.2 PRE-SHIPMENT TESTING. Prior to delivery, Aeryon shall test all Products and Private Label Products using good commercial quality assurance practises, and shall not ship items which fail to pass the test procedures. Datron may from time to time, and at a mutually acceptable time, send its quality control personnel to Aeryon's factory to observe the testing. In addition, Datron may, from time to time, request modifications to Aeryon's test procedures, where repetitive failure to meet Specifications have been noted on shipped equipment. Aeryon shall not unreasonably withhold modifications of these procedures.

9.    END-USER DOCUMENTATION

9.1 SCOPE. Aeryon agrees to provide Datron with content in electronic format (including all illustrations) for all Product-related end-user documentation so that Datron can add thereto any Datron-required modifications and Datron-branded material (resulting in the "Datron Documentation").

(a)     End-user Product documentation content is determined by the Product, and will include, where available, in written format, user guides, hardware installation guides, software configuration and command reference guides, software release notes and hardware errata.

**EXHIBIT A**
**Page 13**

EXHIBIT 4

(b)      As between Aeryon and Datron, Aeryon shall own all right, title and interest in and to the content that Aeryon provides to Datron for all Product-related end-user documentation, and Datron shall own all right, title and interest in and to the modifications and Datron-branded material that Datron adds to such Product-related end-user documentation in accordance with the terms and conditions of this Agreement. Subject to the terms hereof, Aeryon hereby grants to Datron for the term of the Agreement (inclusive of any extensions or associated survival periods), a royalty-free, non-exclusive, non-transferable, non-sublicensable license to use, modify and distribute the Datron Documentation solely in conjunction with the Private Label Products hereunder.

(c)      Notwithstanding the foregoing, Datron shall have the exclusive right to distribute Datron Documentation electronically in conjunction with the Private Label Products.

## 10    SUPPORT AND TRAINING

10.1 CUSTOMER SUPPORT. As part of a customer support package to be resold by Datron, Aeryon will, in a commercially reasonable manner, assist Datron in responding to inquiries and resolving Customers' concerns or complaints about the Products. Datron shall be the primary communication conduit with Customers and shall have primary responsibility for any and all problem resolution efforts concerning the Private Label Products. Aeryon shall only communicate with Customers regarding any Products as requested in writing by Datron.

10.2 TRAINING. Aeryon shall offer, at its expense, its standard training and instruction class in the service and maintenance of the Products or Private Label Products to Datron, up to a maximum of two (2) times during the term of this Agreement, at Datron's Vista, California, headquarters and at times mutually agreed upon by Aeryon and Datron, with such training classes to last no more than three (3) days each.   Any training requested by Datron in excess of this maximum will be at

**EXHIBIT A**
**Page 14**

EXHIBIT 4

Aeryon's discretion and at Datron's expense and cost. Aeryon will, at Datron's cost if in excess of the maximum training requirement set out herein, provide training as requested by Datron or as otherwise needed as new products are added to this Agreement and as existing products are enhanced, which training may include compatibility issues and engineering debug capabilities. If requested, at Datron's cost, Aeryon will provide training for new Products prior to initial shipment of each new product at an Aeryon facility or a location mutually agreed upon by Aeryon and Datron. Datron will bear all travel and living expenses of Aeryon's employees during such training, or, in the event that training is at an Aeryon facility, Datron will bear all costs and expenses of Datron's employees for their attendance at such training. Aeryon shall pay all costs associated with shipping training materials to Datron's Vista, California facilities.

## 11   EXPORT LICENSES; COMPLIANCES WITH LAWS AND REGULATIONS

11.1 Datron shall conduct its activities with respect to the Products and Private Label Products in full compliance with all applicable laws and regulations including but not limited to the export laws and regulations of the United States, and the Foreign Corrupt Practices Act. Datron shall be responsible for, and bear the risk, responsibility, and expenses related to, such compliance.

## 12   GOOD FAITH CONDUCT

12.1 Datron agrees:

i.   to conduct its business in a manner that reflects favourably at all times on the Private Label Products, or Products and the good name, goodwill and reputation of Aeryon;

ii.  to avoid deceptive misleading or unethical practices that are, or might be detrimental to Aeryon, the Private Label Products, or Products or

Page 11 of 29

the public;

    iii.  to make no false, or misleading, or deceptive representations by any means with regard to Aeryon or the Private Label Products, or Products;

    iv.  to make no representations, warranties or guarantees to Customers or to the trade with respect to the specifications, features or capabilities or the Private Label Products, or Products that are inconsistent with the instructions and literature distributed or provided by Aeryon, including all warranties and disclaimers contained therein; and

    v.  to not knowingly sell the Products or Private Label Products to any Customers that engage in illegal or deceptive trade practices.

12.2 Datron shall refrain from copying, reproducing, translating, reverse engineering, disassembling, decompiling, customizing, or otherwise modifying or adapting the Products and Private Label Products, or authorizing any third party to accomplish any of the foregoing, without Aeryon's prior written authorization.

12.3 Datron shall not use or reproduce any of Aeryon trademarks or trade names or distribute, promote, or sell any articles or material bearing Aeryon trademarks or trade names, except in conjunction with the sale, service or repair of the Products and Private Label Products, without the prior written approval of Aeryon.

12.4 Should Datron wish to connect any non-Aeryon product to any Aeryon product, Datron shall first inform Aeryon of the non-Aeryon products in question so that Aeryon may verify compatibility between the Aeryon and non-Aeryon products. Datron shall furnish samples of non-Aeryon products to Aeryon for interface testing upon Aeryon's request, and at Datron's sole cost and expense provided, however, nothing

Page 12 of 29

EXHIBIT 4

contained herein shall require Datron to provide Aeryon with any modification or device (including specifications and/or samples) that would be considered "classified".

## 13   PAYMENT OF EXPENSES

13.1 Aeryon shall not be responsible for any expenses incurred by Datron or its employees or its agents in connection with the sale and promotion of the Products, including the Private Label Products and Services, including but not limited to, any travel, entertainment, clerical, office and equipment
maintenance, stocking, transportation, administrative, and general selling and promotional expenses.

13.2 At Datron's sole expense and cost, Datron may request the presence of a subject matter expert from Aeryon during a customer visit, promotional activity, or to provide information to assist Datron with the modification of Datron's existing government contracts. Aeryon will make reasonable efforts to be present at such customer visit or promotional activity, but shall be under no obligation to attend.

## 14   INDEPENDENT CONTRACTORS/AGENCY

14.1 This Agreement does not constitute either Party as the agent or legal representative of the other Party, for any purpose whatsoever.  Neither Party is granted the authority to assume or create any obligation or responsibility, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner whatsoever.  Each Party shall be an independent contractor and shall not be the servant, agent, or employee of the other Party.

## 15   PERIOD OF AGREEMENT AND TERMINATION

15.1 The initial term of the Agreement shall be for a period of two (2) years from the Effective Date of this Agreement provided this Agreement is not terminated. Provided that Datron is not in default of any of its obligations hereunder, this Agreement

Page 13 of 29

shall be automatically renewed for successive two (2) year terms thereafter unless either Party terminates this Agreement by written notice delivered to the other Party at least sixty (60) days before the expiry of the original term of the Agreement or its renewal term.  Upon termination due to the expiration of the term, neither Aeryon, nor Datron shall be liable to the other for any losses damages or expenses including without limitation, for alleged or actual loss of prospective profits on anticipated sales, or for expenditures, losses, or any other type of commitment made in connection with this Agreement, except for purchase orders issued from Datron to Aeryon prior to the notice of termination.

15.2 This Agreement may be terminated by either of the Parties if the other Party breaches any term or condition of this Agreement and fails to cure its breach, or provide a plan (that is acceptable to the other Party) to remedy the breach, within thirty (30) days of receipt of written notice of such breach from the other Party.  The Parties agree that any failure by Datron to make the required payments to Aeryon under this Agreement can only be remedied or cured by the payment of all amounts so owing to Aeryon unless otherwise agreed to by Aeryon.

15.3. This Agreement shall automatically terminate in the event of a Party's insolvency or an assignment by a Party for the benefit of its creditor(s), or the filing of a petition in bankruptcy with respect to a Party.

15.4. Upon termination or expiration of this Agreement, the following shall occur:
(a) Datron shall pay all amounts owed to Aeryon with respect to all previously rendered and unpaid invoices and in respect of purchase orders which are unfulfilled as of the date of the termination;
(b) each Party shall return to the other all copies of Confidential Information in their possession, power and control; and
(c) subject to the provisions herein, Aeryon shall complete any unfilled purchase orders in its possession.

Page 14 of 29

**EXHIBIT A**
**Page 18**

EXHIBIT 4

Notwithstanding the foregoing, in the event of a termination by Aeryon for a monetary breach by Datron, Aeryon will be under no further obligation to fulfill or satisfy any unfilled purchase orders as of the date of termination.

## 16. FORCE MAJEURE

16.1 The obligations of either Party under this Agreement shall be suspended during the time such Party is prevented or hindered from complying therewith, in whole or in part, by reason(s) of Force Majeure.

16.2 Force Majeure shall mean third party labour disturbances, acts of God, fire, explosion, perils of the sea, flood, storms, earthquakes, tidal waves, riots, sabotage, third party accidents, restrictions or requirements of governmental authorities whether domestic or foreign, acts of war (declared or undeclared) or conditions arising out of or attributable to war, and other similar causes beyond the control and without the fault or negligence of the Party affected, provided that no such cause shall be deemed to be Force Majeure unless the Party affected shall notify the other Party within ten (10) days of the occurrence of said cause, and the Party affected shall thereafter exert all possible diligence to overcome such cause of prevention and hindrance, and to resume performance. Notwithstanding the foregoing, if a Force Majeure event would cause any order to be delayed for a period in excess of 45 days, Datron reserves the right to cancel such order.

## 17. INDEMNITY

17.1 Subject to the provisions hereinafter contained in this Article 17, Aeryon agrees to indemnify, defend and hold harmless Datron and its officers, employees, shareholders and agents against any liability, losses, damages, or expenses, (including reasonable attorneys fees) incurred by Datron, to protect to its business, reputation or good will and any lack or loss of use of the Products or Private Label Products in respect to or resulting from:

Page 15 of 29

(a)     any third party claim, action or proceeding (collectively, a "Claim") brought against Datron that the Products and/or the Private Label Products infringe any of the intellectual property rights of such third party;

(b)     any Claim of bodily injury or death or damage to any real or tangible property sustained by reason of any negligent act or omission on the part of Aeryon as it relates to the Products and/or Private Label Products.

Datron shall use diligent efforts to promptly notify Aeryon in writing of any Claim and provide its full cooperation to reduce expense, damages, and costs associated with such Claim. Notwithstanding the foregoing, nothing contained herein shall require Datron to provide to Aeryon or Aeryon's counsel any documentation or materials that would be considered "classified" unless otherwise required by law after appropriate Court order and appropriate protective orders.  If such item or documentation is relevant to the Claim Datron shall attempt through redaction to provide such parts of such information as would directly impact the claim to Aeryon or Aeryon's counsel subject to, if appropriate, an acceptable protective order which would maintain the confidentiality of such information.

17.2 Upon receipt of notice, Aeryon shall have the sole option at any time to conduct negotiations, in its own name, or on behalf of Datron, and to enter into a settlement with the party or parties involved in the Claim and to intervene in any Claim. Aeryon shall be obligated to immediately after notice thereof assume, conduct, or control the defense thereof, and shall do so at its sole discretion and expense.

17.3 With respect to any  Claim for indemnification pursuant to Section 17.1(a), Aeryon may at its option:

(a)  replace, modify and/or change the Products, at its expense, so that such Product no longer infringes any intellectual property rights of any third party provided it is commercially substantially equal;

(b) obtain a fully paid up license from the third party for Datron to continue to use the Products or Private Label Products; and in either case

EXHIBIT 4

(c) indemnify and defend Datron against such Claims in accordance with section 17.1(a) hereof.

If neither of the above-identified options in Section 17.3(a) or 17.3(b) are reasonably available to Aeryon, then, upon written request by Aeryon, Datron shall return the Products or Private Label Products to Aeryon, and Aeryon will refund the price (including any related shipping, taxes, duties and other related costs) paid by Datron for such Products or Private Label Products, and at Aeryon's option terminate this Agreement.  Notwithstanding the following, Aeryon's maximum liability to Datron shall be limited as follows:

(A)    for Claims set out in Section 17.1(a):

(i)    for direct Claims of Datron separate from any third party claim, limited to the value of any policy limits with respect to intellectual property infringement protection insurance held by Aeryon; and

(ii)    in addition thereto for Claims made against Datron by third parties , limited to the amount of any damages with respect to the third party infringement, via settlement as agreed to by Aeryon or as actually awarded against Datron by a court of competent jurisdiction and any attorneys fees and costs incurred in the defense thereof; and

(B)    for Claims set out in Section 17.1(b):

(i)    for direct Claims of Datron separate from any third party claim, limited to the value of any policy limits with respect to any  liability insurance held by Aeryon payable in respect of such Claim (product liability coverage or otherwise); and

(ii) in addition thereto for Claims made against Datron by third parties , limited to the amount of any settlement as agreed to by Aeryon or actual damages actually awarded against Datron by a court of competent jurisdiction and any attorneys fees and costs incurred in the defense thereof;

(C)    for termination damages, (provided Aeryon terminates this Agreement as provided in Section 17.3 for a Claim for indemnification pursuant to

Page 17 of 29

EXHIBIT 4

Section 17.1(a)), suffered by Datron based on breach of contract claims of third parties for failure to deliver Products or Private Label Products plus such amount as would be reasonably necessary to reimburse Datron for its out of pocket expenses in carrying out, promoting or otherwise complying with the Agreement prior to such termination including any reasonable attorneys fees associated therewith.

The indemnification obligations of Aeryon under this Section 17 shall not apply to any claim or alleged claim of infringement which may be brought resulting from (1) any unauthorized use of the software contained within the Private Label Products and/or the Products; (2) any use of the software or Private Label Products and/or the Products in a manner for which the software or Private Label Products were not designed or in combination with any other product, which combination is the cause of the infringement; (3) any unauthorized modifications to the software made by Datron or its Customers; (4) any settlement or compromise incurred or made by Datron without Aeryon's prior written consent; (5) any breach of the terms of this Agreement by Datron; and/or (6) the Datron Materials or Datron Documentation (including, without limitation, Datron's trademarks, tradenames or the Private Label).

The above states the entire liability of Aeryon with respect to infringement or claimed infringement of intellectual property rights and is in lieu of all warranties, express, implied or statutory, in regard thereto.

17.4 Datron agrees to indemnify and hold harmless Aeryon, and its officers, employees, shareholders and agents, against any liabilities, losses, damages, or expenses, including reasonable attorneys' fees incurred, or likely to be incurred by Aeryon to protect its business, reputation, or goodwill by reason of any act, or omission on the part of Datron, in respect to, arising out of and/or resulting from:

(a)    a breach by Datron of any of its representations, warranties and obligations under this Agreement;

Page 18 of 29

(b)        any prejudicial statements about Aeryon or any misrepresentation or improper representations related to the Private Label Products or Products, or the Datron Documentation to the extent created, implemented or modified by Datron;

(c)        any actual Claim by any third party that the Private Label, or the portion of the Datron Documentation or Private Label Products as created or implemented by Datron (including, without limitation, the Datron trademarks, tradenames or Private Label), infringe the intellectual property or other proprietary rights of any third parties; or

(d)        the modification of or incorporation of the Private Label Products with any other product not provided or approved by Aeryon.

17.5 EXCEPT AS SET OUT HEREIN, UNDER NO CIRCUMSTANCES SHALL AERYON OR DATRON BE LIABLE TO THE OTHER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES (REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT OR IN TORT, FURTHER EXCLUDING FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE) NOR FOR ANY PERSONAL INJURY OR DEATH, NOR FOR LOST PROFITS, EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF.

## 18      FOREIGN CORRUPT PRACTICES ACT

18.1 Datron agrees that it shall take no action or use or spend any funds, regardless of source, in violation of the laws of the United States of America or any country or countries within the Territory, including but not limited to the payment of bribes, kickbacks, political contributions, or other prohibited payments.

## 19. GOVERNING LAW/DISPUTES

19.1 This Agreement, its interpretation, validity, enforcement and any and all disputes arising out of or related to this Agreement, shall be governed and construed in accordance with the laws of the State of California, except for its conflict of laws provisions. The Convention on Contracts for the International Sales of Goods shall not

Page 19 of 29

**EXHIBIT A**
**Page 23**

EXHIBIT 4

apply to this Agreement. Any dispute, controversy or claim arising out of, relating to, or in connection with this Agreement, or the breach termination or validity thereof, which is not settled by mutual agreement of the Parties involved in such dispute, controversy or claim within 30 days of written notice by one Party to the other of the nature of such dispute, shall be finally settled by Arbitration.  The Arbitration shall be conducted in accordance with the Rules of Conciliation and Arbitration of the ICC in effect at the time of the arbitration.  The seat of the Arbitration shall be in New York, NY, U.S.A., and the Arbitration shall be conducted in the English language.

19.2 The Arbitration shall be conducted by one arbitrator, appointment to be by the unanimous consent of the parties involved in such dispute, controversy, or claim, unless such Parties fail to agree, in which event the arbitrator shall be appointed by the ICC.  The sole arbitrator shall be impartial and independent.

19.3 The arbitral award shall be in writing and shall be final and binding on the Parties.  The award may include an award of costs, including reasonable attorney's fees and disbursements.  Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the Parties or their assets.  Any of the Parties shall have the right to have recourse to, and shall be bound by, the prearbitral referee procedure of the ICC in accordance with its rules.

## 20.   RISK OF LOSS

20.1 Except as provided in Section 21 hereof, risk of loss for all Products, including the Private Label Products, purchased by Datron and delivered by Aeryon to Datron hereunder shall pass to Datron upon delivery of the same by Aeryon to Datron's designated shipping agent or to the common carrier if no agent is specified (subject to further exception outlined in Article 7.2 of this Agreement).

EXHIBIT 4

**21. SHIPPING**

21.1 The Products delivered under this Agreement shall be shipped F.C.A in accordance with Incoterms to the Datron facility.  Aeryon shall ship by means specified and directed by Datron.

**22.   WARRANTY**

22.1 Aeryon warrants that all Products and/or Private Label Products meet their Specifications and will be free from defects for a period of one year from the date of acceptance of the same by Datron.

22.2  Provided that Aeryon is notified in writing of any such defects during the warranty period, Aeryon will, upon return of such Products, including Private Label Products, in question to Aeryon for inspection and warranty consideration, at its option and cost and expense shall, replace the Products, including Private Label Products, or provide Datron with parts in  an amount equal to the estimated costs of labor to repair the Products, including Private Label Products.  In either case Aeryon shall bear the burden for the re-shipping costs to Datron or its customer. Datron shall return the defective Products to Aeryon at their earliest convenience and shall bear the burden of the shipping costs to Aeryon.

22.3 Except as set forth in Section 17, the repair or replacement of the Products or Private Label Products shall be Datron's exclusive remedy and shall constitute fulfillment of all liabilities of Aeryon (including, without limitation, direct, indirect, special, incidental or consequential damages) for any  warranty claims  with respect to the Products and/or Private Label Products.

22.4 OTHER THAN AS EXPRESSLY STATED IN THIS SECTION 22 AND TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, AERYON HEREBY DISCLAIMS ALL WARRANTIES,  REPRESENTATIONS AND CONDITIONS,

Page 21 of 29

**EXHIBIT A**
**Page 25**

EXHIBIT 4

WHETHER EXPRESSED, IMPLIED, STATUTORY OR ARISING FROM TRADE
USAGE OR PRACTICE, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF
MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-
INFRINGEMENT. OTHER THAN AS SET FORTH HEREIN, AERYON SPECIFICALLY
DOES NOT WARRANT THAT USE OF THE PRODUCTS OR PRIVATE LABEL
PRODUCTS WILL BE UNINTERRUPTED OR ERROR FREE.

22.5 This warranty is limited exclusively to the component or Product proven to
be defective and will not extend to any other component or Product that may be
damaged while being used in conjunction with the defective Product unless the repair or
the replacement thereof is necessary to correct the defective component or -Product.

**23    NOTICES**

23.1 All notices hereunder to be effective must be sent by first class mail,
postage prepaid, or by commercial courier, or other electronic or facsimile transmission.

23.2 If they are meant for Aeryon, such notices shall be addressed to:

Aeryon Labs, Inc.
60 Bathurst Drive, Unit 1
Waterloo, Ontario N2V 2A9 CANADA
Attn:   Mr. David Kroetsch, President
Tel:    519-489-6726
Email: dave@aeryon.com

23.3 If they are meant for Datron, they shall be addressed to:

Datron World Communications, Inc.
3055 Enterprise Court
Vista, CA 92081 USA

Page 22 of 29

Attn: Mr. Art Barter, President & CEO

Tel: 760-597-3737

Email: abarter@dtwc.com

23.4 All notices will be deemed to be given as of the day they are delivered via courier, faxed or sent via electronic transmission or five (5) days after the day they are sent by mail.

## 24   ASSIGNMENT

24.1 No assignment of this Agreement, or of the rights given by this Agreement, (except the automatic license granted to third parties customers in accordance with the terms of this Agreement  by a sale of the Products or Private Label Products) shall be made by either Party without the written agreement of the other Party hereto.  A change in the voting control or ownership by Datron or its parent or affiliated companies or a sale of all of substantially all of the assets of Datron will be deemed as an assignment under this paragraph.

## 25   WAIVER OF TERMS

25.1 The failure of either Party to require the performance of any term of this Agreement shall not prevent a subsequent enforcement of such term nor be deemed a waiver of any subsequent breach.

## 26   CONFIDENTIALITY

26.1 The Parties shall not reveal, during the term of this Agreement and after the termination of this Agreement, any type of Confidential Information of the other Party, or other details of this Agreement, to third parties without the written consent of the Party disclosing the Confidential Information.  Confidential Information includes, but is not limited to, items such as technical information, intellectual property, proprietary

Page 23 of 29

**EXHIBIT A**
**Page 27**

EXHIBIT 4

information, trade secrets, prices, customer lists, customer contacts, vendors, sales procedures, marketing leads, or other business or financial information or any further information that of a confidential nature to one of the Parties.

26.2 Confidential Information as used herein does not include; (i) information that is now or subsequently becomes generally available to the public, or is generally known in the industry, through no fault of any Party or any breach of this Agreement; (ii) information that any Party can demonstrate it had rightfully in its possession prior to disclosure to it by the other Party; and (iii) information that any Party rightfully obtains from a third party to this Agreement, where such person had the right to transfer or disclose such information without any breach to this Agreement.

## 27   MODIFICATIONS

27.1 Any modification, alteration, or amendment to this Agreement shall not be valid or binding with respect to any Party unless written and signed by both Parties hereto.

## 28   ENTIRE AGREEMENT

28.1 Except as otherwise indicated herein by reference to specific documents, this Agreement constitutes the entire agreement between the Parties concerning the subject matter of this Agreement, and the Parties acknowledge and agree that neither has made any representation with respect to the subject matter of this Agreement, or any representations inducing the execution and delivery hereof, except as specifically set forth herein.

Page 24 of 29

**EXHIBIT A**
**Page 28**

EXHIBIT 4

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement through their duly authorized representatives, effective as of the date first written above.

For:  Aeryon Labs, Inc.                          For:   Datron World Communications,
Inc.

By: _____              By: _____
David Kroetsch                                        Art Barter
President                                                  President/CEO

Attachments:

Exhibit A – Territory
Exhibit B – Products/Pricing
Exhibit C – Product Specifications

**EXHIBIT A**
**TERRITORY**

<u>Exclusive</u>:

**Products and Private Label Products sold through**
**U.S. Government Foreign Military Sales (FMS)**
**and Foreign Military Financing (FMF)**

Aeryon shall not knowingly allow other parties access to the exclusive Territory for
the purpose of marketing Products to Customers.  Excepted from the exclusive Territory
shall be sales by systems integrators through FMF/FMS where such systems
integrators are selling product improvements and enhancements under the Aeryon
name in addition to the Products

<u>Non-exclusive to Datron</u>:

**Worldwide**

<u>Excluded</u>:

**Sales by Datron in Canada**

**Additional Exceptions:**

| Account | Agreed Exception |
|---------|------------------|
| SkyDroids sales to UK MoD | For sales to the UK MoD SkyDroids will purchase Products through Datron. . |
| Saudi Arabian Ministry of Defense | Datron and its reps will stand down on any opportunities within the Saudi Arabian Ministry of Defense |
| | |

Page 26 of 29

**EXHIBIT A**
**Page 30**

EXHIBIT 4

## EXHIBIT B
## PRODUCTS/ PRICE SCHEDULE

|  | Part Number | Datron Price (USD) |
|---|---|---|
| System Complete | DTWC-000001-01 | $50,000 |
| Vehicle (Body Only) | DTWC-000002-01 | $25,000 |
| Vehicle (Body Only) | DTWC-000002-02 | $25,000 |
| Set of Legs (4) | DTWC-000003-01 | $1,075 |
| Pair of Arms | DTWC-000004-01 | $500 |
| Arm Black and White | DTWC-000004-01B | $250 |
| Arm Red | DTWC-000004-01R | $250 |
| Base Station | DTWC-000005-01 | $10,000 |
| Smart Battery | DTWC-000006-01 | $1,500 |
| Smart Battery Charger | DTWC-000007-01 | $4,000 |
| Daylight Photo3S | DTWC-000008-02 | $3,750 |
| Programming Payload | DTWC-000009-00 | $1,000 |
| Case – Mission | DTWC-000010-00 | $800 |
| Case – Support | DTWC-000011-00 | $800 |
| Command Station (h/w only) | DTWC-000012-00 | $4,100 |
| C&C Software | DTWC-000013-00 | $6,000 |
| Leg with Antenna | DTWC-000014-00 | $325 |
| Leg without Antenna | DTWC-000015-00 | $250 |
| FLIR CAMERA GIMBAL, Tau 640, 19mm, 9Hz Video | DTWC-000021-00 | $18,500 |
| VIDEOZOOM 10X COLOUR CAMERA | DTWC-000023-00 | $6,000 |
| Propeller Black & White | DTWC-000025-01B | $90 |
| Propeller Red | DTWC-000025-01R | $90 |
| Pair of Arms – High Altitude | DTWC-000026-00 | $1000 |
| Arm – High Altitude - Red | DTWC-000026-00R | $500 |
| Arm – High Altitude – B & W | DTWC-000026-00B | $500 |
| HD Video Camera | DTWC-000027-00 | $3,600 |
| Photo3S NIR | DTWC-000028-00 | $6,000 |
| VideoZoom10X Monochrome | DTWC-000030-00 | $6,000 |
| Civilian System Complete | DTWC-000040-00 | $40,000 |

**where System Complete consists of:**
- 1 x Vehicle (Body Only)
- 2 x Legs (sets of 4 – 3 w/o antenna, 1 w/ antenna)
- 8 x Motor Arms
- 1 x Base Station
- 6 x Battery
- 1 x Charger Complete
- 1 x Photo3S
- 1 x Programming Payload
- 1 x Case -- Mission
- 1 x Case -- Support
- 1 x Command Station (tablet PC)
- 1 x Command and Control Software License
- 1 x Operating and Maintenance Manual

**And documentation relating to any and all of the foregoing.**

**EXHIBIT A**
**Page 31**

EXHIBIT 4

**where Civilian System Complete consists of:**
    1 x Civilian Vehicle (wi-fi Body Only)
    1 x Legs (set of 4 – 3 w/o antenna, 1 w/ antenna)
    4 x Motor Arms
    4 x Battery
    1 x Charger Complete
    1 x Photo3S
    1 x Programming Payload
    1 x Case – Mission
    1 x Command Station (tablet PC)
    1 x Command and Control Software License
    1 x Operating and Maintenance Manual

**And documentation relating to any and all of the foregoing.**

**EXHIBIT A**
**Page 32**

EXHIBIT 4

## EXHIBIT C
## PRODUCT SPECIFICATIONS (SYSTEM COMPLETE)

**System Specifications**
Temperature Range                                     -10°C to 50°C
International Protection Rating                        IP54
**Aerial Vehicle**
Flight Duration                                       ≤20 minutes
Maximum Range                                         3 km
Maximum Height                                        500 m
Maximum Wind Speed                                    50 km/hr
Maximum Flight Speed                                  50 km/hr
Weight                                                ≤1.5 kg
GPS Accuracy                                          between 3m and 4m
**Base Station**
Battery Duration                                      ≥1 hour
Recommended elevation                                 ≥0.5 meters
**Command Station**
GUI                                                   English, metric
Battery Duration                                      ≥2 hours
**Communications**
Aerial Vehicle to Base Station                        900MHz modem (1.3GHz or 400/350Hz
                                                      can be quoted)
Base Station to Command Station                       WiFi
Encryption                                            Available on request (export controlled)
**Daylight Colour Camera**
*Still*
Resolution                                            5 M-Pixel
FOV                                                   38.5 degrees
Output Format                                         JPEG
Geo Tagged                                            Yes
*Video*
Resolution/Frame Rate                                 320 x 240 @ 30 fps or 640 x 480 @ 12 fps
Output Format                                         MPEG 4
**Battery**
Recharge time                                         ~ 1 hour
**Safety Features**
Start up safety check                                 Return on Communications Loss
Return on Low Battery                                 Land on GPS Loss
Return on Wind Speed greater than safe limit
**System Configuration**
Aerial Vehicle                                        5MP Still Camera with Video
Base Station                                          User's Manual (English)
Command Station                                       Carrying Cases
SMART Batteries                                       Spares
Battery Charger                                       Simulator Mode (Training)
**Maintenance**
Field                                                 LRU, No Tools Required
Depot                                                 Propellers, Camera Domes
Factory                                               Batteries, Aerial Vehicle, Base Station,
Arms
Software                                              Remote upgrade capability provided.
                                                      Remote Diagnostics Feature available.

**EXHIBIT A**
**Page 33**

EXHIBIT 4

Amendment to Private Label Distribution Agreement

between

Aeryon Labs, Inc and Datron World Communications

dated

July 20th 2012

The following are to be added to Exhibit B – Products/Price Schedule:

For purposes of clarification, the ASR products in this amendment are to be sold by Datron as Aeryon branded products and are not to be private labeled by Datron.

All other terms and conditions of the agreement remain unchanged.

| Item Number | Description | Aeryon List Price | Datron Buy Price (37% Discount) |
|---|---|---|---|
| ASR-001B | AERYON SKY RANGER SYSTEM BASE SYSTEM EO CAMERA | $100,000 | $63,000 |
| ASR-001B/IR | AERYON SKY RANGER SYSTEM BASE SYSTEM EO/IR CAMERA | $125,000 | $78,750 |
| ASR-001S | AERYON SKY RANGER SYSTEM STANDARD | $140,000 | $88,200 |
| ASR-001S1 | AERYON SKY RANGER SYSTEM STANDARD KIT1 | $180,000 | $113,400 |
| ASR-002B | AERYON SKY RANGER SUPPORT KIT BASE | $15,000 | $9,450 |
| ASR-010 | AERYON SKY RANGER AERIAL BODY | $40,000 | $25,200 |
| ASR-020 | AERYON SKY RANGER SET ARMS | TBD | TBD |
| ASR-030 | AERYON SKY RANGER SET LANDING GEAR | TBD | TBD |
| ASR-041 | AERYON SKY RANGER BATTERY – LONG DURATION | TBD | TBD |
| ASR-060 | AERYON SKY RANGER BASE STATION | TBD | TBD |
| ASR-061 | AERYON SKY RANGER BASE BATTERY | TBD | TBD |
| ASR-102 | AERYON SKY RANGER EO/IR | TBD | TBD |

Signed: _[signature]_

For: Aeryon Labs, Inc.

Name: DAVID KROETSCH

Date: 10/21/2013

Signature:

For: Datron World Communications

Name: Kevin J. Kane

Date: 10/10/2013

Signature: _[signature]_